**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

---

JIM HODGES, Governor of the State
of South Carolina, in his official
capacity,

               *Plaintiff-Appellant,*

        v.

SPENCER ABRAHAM, Secretary of the
Department of Energy, in his
official capacity; UNITED STATES
DEPARTMENT OF ENERGY,

               *Defendants-Appellees,*

       and

MEDIA GENERAL OPERATIONS,
INCORPORATED, d/b/a Morning News
(Florence), WBTW, WSPA, WCBD
and WJBF; AIKEN COMMUNICATIONS,
INCORPORATED, d/b/a The Standard
(Aiken); OSTEEN PUBLISHING
COMPANY, INCORPORATED, d/b/a The
Item (Sumter); EAST COAST
NEWSPAPERS, INCORPORATED, d/b/a
Island Packet, d/b/a The Herald
(Rock Hill), d/b/a The Beaufort
Gazette; THE EVENING POST
PUBLISHING COMPANY, d/b/a The Post
and Courier (Charleston); COLUMBIA
NEWSPAPERS, INCORPORATED, d/b/a
The State (Columbia); THE SUN
PUBLISHING COMPANY, INCORPORATED,
d/b/a Sun News; THE NEW YORK

No. 02-1639

TIMES COMPANY, d/b/a The Herald-Journal (Spartanburg); INDEPENDENT PUBLISHING COMPANY, INCORPORATED, d/b/a Anderson Independent-Mail; LANDMARK COMMUNITY NEWSPAPERS OF SOUTH CAROLINA, d/b/a The Lancaster News; JEFFERSON-PILOT COMMUNICATIONS COMPANY, d/b/a WCSC; PACIFIC AND SOUTHERN COMPANY, INCORPORATED, d/b/a WLTX; THE SOUTH CAROLINA PRESS ASSOCIATION; SOUTH CAROLINA BROADCASTERS; ASSOCIATED PRESS; LEE ENTERPRISES, INCORPORATED, d/b/a The Times and Democrat,

*Parties in Interest,*

and

DAVID R. BLACK, individually and on behalf of a class of Citizens of the State of South Carolina; DAVID G. CANNON, individually and on behalf of a class of citizens of the State of South Carolina; HUGH CARL GOODING, individually and on behalf of a class of citizens of the State of South Carolina; EDWARD LEMON, individually and on behalf of a class of citizens of the State of South Carolina,

*Movants.*

ENVIRONMENTALISTS, INCORPORATED,

*Amicus Curiae.*

Appeal from the United States District Court
for the District of South Carolina, at Aiken.
Cameron McGowan Currie, District Judge.
(CA-02-1426-1-22)

Argued: July 10, 2002

Decided: August 6, 2002

Before WIDENER, NIEMEYER, and KING, Circuit Judges.

---

Affirmed by published opinion. Judge King wrote the opinion, in which Judge Widener and Judge Niemeyer joined.

---

## COUNSEL

**ARGUED:** William LeRoy Want, Charleston, South Carolina, for Appellant. Jeffrey Bossert Clark, Deputy Assistant Attorney General, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellees. **ON BRIEF:** Stephen P. Bates, OFFICE OF THE GOVERNOR, Columbia, South Carolina, for Appellant. Thomas L. Sansonetti, Assistant Attorney General, Gregory D. Page, Lisa E. Jones, Environment and Natural Resources Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; J. Strom Thurmond, Jr., United States Attorney, Robert F. Daley, Jr., Assistant United States Attorney, Christie Newman Barrett, Assistant United States Attorney, Columbia, South Carolina; Lee L. Otis, General Counsel, Marc Johnston, Office of General Counsel, DEPARTMENT OF ENERGY, Washington, D.C., for Appellees. Ruth Thomas, Pro Se, for Amicus Curiae.

---

## OPINION

KING, Circuit Judge:

Jim Hodges, the Governor of South Carolina, has appealed the June 13, 2002, Order of the district court, which awarded summary judg-

ment to the United States Department of Energy and its Secretary, Spencer Abraham (collectively, the "DOE"). Governor Hodges contends that the DOE has failed to comply with the National Environmental Policy Act ("NEPA") in connection with its transfer of surplus plutonium from Colorado to South Carolina. In response, the DOE maintains that Governor Hodges lacks standing to pursue this case and that, in any event, it has complied with the mandate of NEPA. As explained below, we conclude that, although the Governor possesses standing to maintain this action, NEPA has not been contravened. We therefore affirm.

I.

In 1995, the DOE began to consider the issues of whether and how to close its Rocky Flats Environmental Technology Site near Denver, Colorado ("Rocky Flats"). In order to carry out such a closing, the DOE must transfer the plutonium at Rocky Flats to other DOE sites for storage and eventual disposition.[1] As such, the DOE considered utilizing its Savannah River Site (the "SRS"), located near Aiken, South Carolina, for the storage and disposition of the Rocky Flats plutonium. It prepared various NEPA compliance documents and materials analyzing and explaining the potential use of SRS for these purposes. After nearly seven years of study, the DOE announced, in its April 19, 2002, Amended Record of Decision (the "April 19 ROD"), that six metric tons[2] of surplus plutonium will be transferred from Rocky Flats to SRS for long-term storage.

On May 1, 2002, Governor Hodges initiated this lawsuit, seeking to enjoin the DOE from shipping the Rocky Flats plutonium into the Palmetto State. He maintained that the DOE violated NEPA in failing to properly consider the environmental consequences of its April 19 ROD, and that it had failed to comply with NEPA procedures prior

---

[1]Plutonium is a highly radioactive, metallic element that exists in approximately fifteen different variations. The explosive triggers (i.e., pits) at the core of modern nuclear weapons are largely composed (at least 93%) of a particular type of plutonium — Plutonium 239. In discussing this "weapons-grade" plutonium, we refer to it simply as plutonium.

[2]A metric ton weighs approximately 2,204.6 pounds.

to issuance of the ROD. On cross-motions for summary judgment, the district court rejected the positions of Governor Hodges in their entirety, and it declined to award injunctive relief against the DOE.[3] *Hodges v. Abraham*, CA No. 1:02-1426-22, Memorandum Opinion and Order (D.S.C. June 17, 2002) (the "Opinion").[4] On appeal, the DOE contends, for the first time, that Governor Hodges lacks standing to pursue his claims in this case. Before analyzing the standing question (which implicates our jurisdiction in this proceeding) and the merits of Governor Hodges's appeal, we will review the pertinent facts and legal principles governing the NEPA issues presented.[5]

## II.

## A.

The events giving rise to this dispute began over fifty years ago, with the advent of nuclear technology and nuclear weapons. During the Cold War — from the late 1940s to the late 1980s — the United States and the Soviet Union engaged in a nuclear arms race, and they produced thousands of nuclear weapons powered by tons of plutonium. Following the demise of the Soviet Union and the end of the

---

[3]After being unsuccessful in district court, Governor Hodges sought an injunction pending appeal and a stay pending appeal from that court. When these requests were denied, the Governor sought an injunction pending appeal in this Court. By Order of June 20, 2002, we denied the Governor's request for such an injunction. However, we expedited his appeal and heard oral argument in Abingdon, Virginia, on July 10, 2002.

[4]Acknowledging the urgency of this proceeding, the district court rendered its decision orally from the bench on June 13, 2002, advising that it would file a written decision shortly thereafter. The court filed its Opinion on June 17, 2002.

[5]Certain national and local media were Parties in Interest in the district court, in connection with an effort by the DOE to seal certain parts of its administrative record. On June 14, 2002, the district court granted in part the DOE's request to seal. That ruling is not at issue in this appeal. In addition, several citizens of South Carolina sought to intervene in the district court on behalf of themselves and other residents of South Carolina. The court denied their motion on June 4, 2002, and that ruling is also not before us.

Cold War, our country and the post-Soviet government of Russia acted both bilaterally and unilaterally to reduce their nuclear weapons stockpiles. In January 1994, they issued a *Joint Statement Between the United States and Russia on NonProliferation of Weapons of Mass Destruction and Means of their Delivery*, which established the mutual goal of "safe, secure, long-term storage and disposition of surplus fissile materials." In order to demonstrate our nation's commitment to this goal, President Clinton, on March 1, 1995, unilaterally announced that a total of 38.2 metric tons of our plutonium was no longer necessary for defense purposes, and that it therefore constituted "surplus plutonium."[6] In September 2000, the United States and Russia formally pledged in writing that each would dispose of thirty-four metric tons of surplus plutonium. *Agreement Between the Government of the United States of America and the Government of the Russian Federation Concerning the Management and Disposition of Plutonium Designated as No Longer Required for Defense Purposes and Related Cooperation*. Pursuant to this Agreement, each country committed to "seek to begin operation of facilities [to dispose of the surplus plutonium] . . . not later than December 31, 2007."

B.

In this country, the responsibility for monitoring, storing, and disposing of nuclear materials, including plutonium, necessarily rests with the federal Government, specifically the DOE. 42 U.S.C. §§ 7112(10), 7133(a)(8). Since the President's 1995 pledge, the DOE has studied and explored several options aimed at determining the most effective way to fulfill its responsibility to store and dispose of our nation's surplus plutonium. Throughout this effort, the DOE has been subject to the requirements of NEPA, a statute enacted in 1969 to ensure that environmental concerns play a role in government decisionmaking.

---

[6]The use of the terms "surplus" and "non-surplus" in referring to plutonium have no technical or scientific significance. Surplus plutonium is that which our Government has determined to be unnecessary for the national defense, while non-surplus plutonium remains essential.

### 1.

NEPA establishes "a national policy of protecting and promoting environmental quality." *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). Although NEPA does not place substantive requirements on federal agencies, it requires them to follow certain procedures prior to undertaking any "proposed action," "proposal," or "project" that may affect the environment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Once the proper NEPA procedures are completed, i.e., "the adverse environmental effects of the proposed action are adequately identified and evaluated," a federal agency is entitled to "decid[e] that other values outweigh the environmental costs." *Id.* As the Supreme Court has observed, "NEPA merely prohibits uninformed — rather than unwise — agency action." *Id.* at 351.

The purpose of NEPA is two-fold. First, it ensures that an "agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." *Id.* at 349. In other words, NEPA guarantees that an agency will take "a 'hard look' at environmental consequences" before making a decision that may affect the environment. *Id.* at 350 (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). Second, compliance with NEPA procedures "ensures that relevant information about a proposed project will be made available to members of the public so that they may play a role in both the decisionmaking process and the implementation of the decision." *Hughes River*, 81 F.3d at 443.

Pursuant to Section 102 of NEPA, a federal agency must prepare an environmental impact statement ("EIS") for every "recommendation or report on proposals for . . . major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). The Council on Environmental Quality ("CEQ"), a governmental body created by NEPA for the purpose of advising the President on environmental matters, has promulgated extensive regulations to aid federal agencies in determining whether a proposed action might significantly affect the quality of the human environment. 40 C.F.R. § 1500.3 (providing that CEQ guidelines are binding on all federal agencies); 10 C.F.R. §§ 1021.100-103 (incorporating

CEQ guidelines into DOE regulations).[7] In determining whether an environmental impact is significant, the CEQ regulations require agencies to consider both the "context" and the "intensity" of the potential impact of a proposed action, with the former focusing on the affected geographical region and its interests, and the latter looking to the severity of the proposal's environmental impact. 40 C.F.R. § 1508.27. If, in the circumstances, it is unclear whether an EIS is necessary, the agency is obliged to complete what is known as an environmental assessment ("EA"), which is a "concise public document" reviewing and analyzing whether an EIS is required. 40 C.F.R. § 1508.9.

A federal agency's responsibilities under NEPA do not end with the preparation of an EIS. If an agency's plans change, or if the circumstances surrounding a project are altered, NEPA obligations may be triggered. As the Supreme Court has observed, "[i]t would be incongruous with [NEPA's] approach to environmental protection . . . for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to completion of agency action simply because the relevant proposal has received initial approval." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989). The CEQ regulations mandate that a federal agency prepare a supplemental environmental impact statement ("SEIS") if "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or if "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). In addition, the DOE's regulations for the implementation of NEPA provide that it "shall prepare [an SEIS] if there are substantial changes to [a] proposal or significant new circumstances or information relevant to environmental concerns." 10 C.F.R. § 1021.314(a). If it is unclear whether an SEIS is required in connection with one of its projects, the DOE is obliged to prepare what is called a supplement analysis ("SA"). 10 C.F.R. § 1021.314(c). Under the DOE's regulations, an SA must contain sufficient information for the DOE to determine (1)

---

[7]The CEQ requires each federal agency to adopt its own procedures for implementing NEPA requirements. 40 C.F.R. § 1507.3. The CEQ's NEPA regulations are found at 40 C.F.R., pts. 1500-08, while the DOE's regulations implementing NEPA are found at 10 C.F.R., pt. 1021.

whether an existing EIS should be supplemented, (2) whether a new EIS should be prepared, or (3) whether no further NEPA documentation is necessary. 10 C.F.R. § 1021.314(c)(2). In sum, NEPA requires the DOE, before undertaking a proposed action or altering an existing one, to examine the environmental consequences thereof.[8]

2.

In the wake of the President's 1995 pledge that the United States would dispose of 38.2 metric tons of surplus plutonium, the DOE began exploring its options with respect to the storage and disposition of the surplus plutonium at Rocky Flats. The DOE's continuing effort to comply with NEPA included the following statements, analyses, and records of decision:

- in December 1996, the *Storage and Disposition of Weapons-Usable Fissile Materials Final Programmatic Environmental Impact Statement* (the "1996 PEIS");[9]

- in July 1998, the *Supplement Analysis for Storing Plutonium in the Actinide Packaging and Storage Facility and Building 105-K at the Savannah River Site* (the "1998 SA");

- in November 1999, the *Surplus Plutonium Disposition Final Environmental Impact Statement* (the "November 1999 EIS");

- in January 2000, the *Record of Decision for the Surplus Plutonium Disposition Final Environmental Impact Statement* (the "2000 ROD");

---

[8]Under its regulations, DOE is not required to study the environmental effects of a proposed action when that action fits a categorical exclusion, i.e., an activity that the DOE has already determined to be environmentally inconsequential. 10 C.F.R. § 1021.410.

[9]A programmatic environmental impact statement is a "broad-scope EIS . . . that identifies and assesses the environmental impacts of a DOE program." 10 C.F.R. § 1021.104(b).

- in January 2001, the *Amended Record of Decision* (the "2001 ROD");

- in February 2002, the *Supplement Analysis for Storage of Surplus Plutonium Materials in the K-Area Material Storage Facility at the Savannah River Site* (the "2002 SA");

- in April 2002, the *Amended Record of Decision* (the April 19 ROD).

We now turn to the contents and conclusions of these NEPA materials.

a.

In December 1996, the DOE issued its 1996 PEIS, which studied various alternatives for the storage and disposition of this country's surplus and non-surplus plutonium. One of the goals of the 1996 PEIS was the reduction of the number of sites utilized by the DOE as federal storage facilities for plutonium. Toward that end, the 1996 PEIS proposed closing Rocky Flats and transferring its plutonium to other DOE sites. The DOE's preferred alternative contemplated, inter alia, the possibility of building three new facilities at SRS and the prompt transfer of some of the Rocky Flats plutonium to the new SRS facilities. The additional SRS facilities contemplated by the 1996 PEIS were:

(1) A plutonium storage facility known as the Actinide Packaging and Storage Facility ("APSF"). The decision to build APSF had actually been made in 1995, and its original purpose was to stabilize, package, and store materials already located at SRS. 60 Fed. Reg. 65,800 (Dec. 12, 1995). The 1996 PEIS, however, proposed modifying the construction plans for APSF to allow for the receipt of plutonium from Rocky Flats.

(2) A facility that could dispose of surplus plutonium through "immobilization." The process of immobilization

calls for surplus plutonium to be placed "in glass or ceramic material for disposal in a geologic repository pursuant to the Nuclear Waste Policy Act." 62 Fed. Reg. 3014 (Jan. 21, 1997). In 1996, SRS already had waste-processing facilities that could be dedicated to immobilization, but the 1996 PEIS contemplated modifying those facilities or constructing new ones to handle the immobilization of some of the nation's surplus plutonium.

(3) A facility to convert surplus plutonium into mixed oxide fuel ("MOX Fuel"). The 1996 PEIS proposed utilizing a MOX Fuel disposition strategy in conjunction with immobilization, by which surplus plutonium would be mixed with uranium dioxide and burned "in existing[ ] domestic, commercial reactors, with subsequent disposal of the spent fuel in a geologic repository pursuant to the Nuclear Waste Policy Act." 62 Fed. Reg. 3014 (Jan. 21, 1997). As with immobilization, the 1996 PEIS did not rule out simply modifying existing buildings at SRS to create the MOX Fuel fabrication facility.

Although the preferred alternative of the 1996 PEIS addressed only the short-term storage of surplus plutonium at SRS pending its disposition, the 1996 PEIS also studied other options. One such proposal was to upgrade the contemplated APSF to handle the long-term storage of surplus plutonium from several DOE sites, including Rocky Flats, for up to fifty years pending its disposition.

b.

In July 1998, the DOE prepared the 1998 SA, announcing that it could save the Government approximately $1.3 billion by closing Rocky Flats in 2006, four years earlier than had been previously contemplated. Prior to closing Rocky Flats, however, it was necessary for the DOE to transfer all of that facility's plutonium to other DOE sites. This planned plutonium transfer was complicated by the fact that the APSF, which was to serve as the SRS storage facility for the plutonium from Rocky Flats, was not scheduled to be completed by the time such plutonium shipments were to commence. The 1998 SA consequently analyzed whether an existing building at SRS — Build-

ing 105-K, also known as KAMS ("SRS-KAMS") — could be expanded and modified for interim storage of the Rocky Flats plutonium for a period of up to ten years. The 1998 SA concluded that there would be no environmentally significant difference in storing the Rocky Flats plutonium at SRS-KAMS for up to ten years, rather than (as the 1996 PEIS had contemplated) at APSF. Thus, in the 1998 SA, the DOE concluded that no further NEPA study or documentation was necessary with respect to the temporary storage of the Rocky Flats plutonium at SRS-KAMS.

c.

In its November 1999 EIS, the DOE took the next step in the NEPA process leading to the present controversy, by examining how to dispose of up to fifty metric tons of plutonium.[10] Specifically, the November 1999 EIS analyzed the utilization of a "hybrid approach" to surplus plutonium disposition, whereby thirty-three metric tons of plutonium would be converted into MOX fuel and seventeen metric tons would be immobilized. Thereafter, on January 11, 2000, the DOE issued its 2000 ROD, announcing that it intended to pursue the hybrid disposition approach studied in the November 1999 EIS. 65 Fed. Reg. 1608 (Jan. 11, 2000). Pursuant thereto, SRS was designated as the site for both the immobilization facility and the MOX Fuel facility. The 2000 ROD provided, however, that "[t]he construction of new facilities for the disposition of surplus U.S. plutonium would not take place unless there is significant progress on plans for plutonium disposition in Russia." *Id.* at 1620.

d.

In January 2001, the DOE again altered its plans. In the 2001 ROD,

_____

[10]The November 1999 EIS stated that this fifty metric tons included "[the] 38.2 [metric tons] of weapons-grade plutonium already declared by the President as excess to national security needs, . . . weapons-grade plutonium that may be declared surplus in the future, as well as weapons-usable, reactor-grade plutonium that is surplus to the programmatic and national defense needs of DOE." The six metric tons from Rocky Flats, which is at issue in this proceeding, was included in the fifty metric tons referred to in the November 1999 EIS.

it abandoned its plan to construct the APSF at SRS, and it instead decided to modify an existing building at SRS for the interim storage of surplus plutonium, pending its disposition. 66 Fed. Reg. 7888 (Jan. 26, 2001). As we have noted, the DOE, in its 1998 SA, had contemplated storage of the Rocky Flats plutonium at the SRS-KAMS facility for up to ten years. With the cancellation of the APSF project, however, the DOE recognized that it might be necessary to store surplus plutonium in the SRS-KAMS facility for a longer period of time, and it then proceeded to assess the feasability of long-term plutonium storage at SRS-KAMS. As a result, the DOE issued the 2002 SA. The DOE therein examined whether the long-term storage of plutonium at SRS-KAMS created any new environmental impacts not previously considered in the 1996 PEIS and the 1998 SA, and it determined that none existed. The DOE therefore concluded that the "safe storage of surplus plutonium in KAMS can continue beyond 10 years pending disposition," and that no further NEPA study was necessary. 2002 SA at 8.

e.

During 2001, the schedule for design, construction, and operation of the immobilization facility at SRS was delayed indefinitely by budgetary constraints. The DOE thereafter announced, inter alia, in its April 19 ROD: (1) that it was cancelling its plans to immobilize plutonium at SRS; and (2) that SRS-KAMS had been selected as the consolidated long-term storage site for the surplus plutonium at Rocky Flats. 67 Fed. Reg. 19,432 (Apr. 19, 2002). The April 19 ROD also stated that the prospect of disposing of surplus plutonium by converting it into MOX Fuel was still under consideration by the DOE and would be determined after further study. In reaching the decisions set forth in the April 19 ROD, the DOE expressly relied on the fact that it had "reviewed the [1996] PEIS and related Supplement Analyses and . . . determined that the analyses remain valid for the decisions announced herein." *Id.* at 19,434. Observing that those analyses had explored the impact of the long-term storage of plutonium at SRS generally, and at SRS-KAMS in particular, the DOE concluded that the environmental effects of the long-term storage of the Rocky Flats plutonium at SRS-KAMS had been adequately considered. *Id.* The DOE therefore determined that it need not perform any further study of the environmental consequences of its decision. Upon issuance of

the April 19 ROD, the DOE indicated that it would immediately begin shipment of the Rocky Flats plutonium to SRS.

C.

On May 1, 2002, Governor Hodges filed his complaint against the DOE in the District of South Carolina. The Governor sought a declaratory judgment that the DOE's April 19 ROD contravened NEPA, and he also sought an injunction prohibiting the DOE from transferring surplus plutonium from Rocky Flats to SRS. Following a hearing conducted in Aiken on June 13, 2002, the district court orally ruled against the Governor. In so doing, the court granted the DOE's motion for summary judgment and declined to enjoin the DOE's transfer of the Rocky Flats plutonium to SRS. Four days later, the court filed its Opinion, reducing its bench ruling to writing.[11]

Governor Hodges then filed a timely appeal from the adverse rulings of the district court. He also moved for an injunction pending appeal, seeking to have us enjoin the DOE from shipping the Rocky Flats plutonium to SRS during his appeal. By Order of June 20, 2002, we declined to award the Governor such an injunction, and we expedited this proceeding. On appeal, Governor Hodges maintains that the DOE failed to comply with NEPA before issuing its April 19 ROD, and he requests that we enjoin the DOE from shipping the Rocky Flats plutonium to SRS until the DOE has fulfilled its NEPA obligations.[12] In response, the DOE asserts that Governor Hodges lacks

_____

[11]According to media reports issued prior to the district court's Opinion, Governor Hodges asserted that he would lie down in the highway to block any shipment of plutonium into South Carolina. After the court rejected his request for injunctive relief, the Governor issued an executive order declaring that the "transportation of plutonium on South Carolina roads and highways is prohibited." The court, on June 18, 2002, issued a permanent injunction against the Governor, prohibiting him from interfering with the DOE's plutonium shipments "into or through South Carolina." *Dep't of Energy v. Hodges*, C.A. No. 1:02-2078-22, Order (D.S.C. June 18, 2002). We are not called on to address any issues concerning that injunction.

[12]In his complaint, Governor Hodges asserts that the April 19 ROD makes SRS the nation's long-term storage site for surplus plutonium, and

standing to initiate and pursue this case, and that it has complied with NEPA.[13]

### III.

Because our jurisdiction has been called into question, we must, before turning to the merits of Governor Hodges's appeal, first examine whether he possesses the necessary standing to pursue this action. While the DOE did not raise the issue of standing in the district court, standing to sue is a jurisdictional issue of constitutional dimensions, and it may be raised and addressed for the first time on appeal.[14] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998).

Pursuant to Article III of the Constitution, federal courts may only adjudicate actual cases and controversies.[15] *Allen v. Wright*, 468 U.S.

---

he seeks an injunction prohibiting the DOE from shipping "any surplus plutonium from Rocky Flats or anywhere else to SRS unless and until DOE complies with applicable law." The April 19 ROD, however, dealt solely with the shipment and storage of the six metric tons of Rocky Flats plutonium. As such, we are called on to address only that decision.

[13]This dispute does not relate to the storage of nuclear waste at Yucca Mountain, Nevada. The Yucca Mountain facility is intended to serve as a permanent repository for spent nuclear fuel and high-level radioactive waste, while this case involves the storage of surplus weapons-grade plutonium.

[14]The DOE initially raised the issue of standing on July 2, 2002, when it submitted its brief on appeal. Governor Hodges was thereby first able to respond to the issue in his reply brief of July 5, 2002. In these circumstances, interests of professional courtesy and judicial efficiency dictate that the DOE should have communicated its intention to challenge standing more promptly. That said, we appreciate the diligence and able assistance of all counsel in this expedited proceeding.

[15]The constitutional underpinning of the doctrine of standing to sue is found in Section 2 of Article III of the Constitution of the United States, which provides in pertinent part that:

> The judicial Power shall extend to all Cases . . . arising under this Constitution, the Laws of the United States, and Treaties made . . . under their Authority . . . [and] to Controversies to which the United States shall be a Party[.]

737, 750 (1984). The standing doctrine is designed to ensure that federal litigants possess a sufficiently personal stake in the outcome of any litigation they pursue. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992); *see also Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982) (observing that federal courts are not "publicly funded forums for the ventilation of public grievances or the refinement of jurisprudential understanding"). As spelled out by the Supreme Court, the "irreducible constitutional minimum of standing contains three elements." *Defenders of Wildlife*, 504 U.S. at 560. In order to possess standing to sue, a plaintiff must show (1) that he has suffered an "injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) that his injury is "fairly traceable to the challenged action of the defendant"; and (3) that his injury will likely be redressed by a favorable decision. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (quotation and citation omitted); *Defenders of Wildlife*, 504 U.S. at 560-61. In this case, Governor Hodges is plainly capable of satisfying the last two elements of the standing test enunciated by the Court. The DOE asserts, however, that the Governor falls short on the first element, because he has not suffered an "injury in fact" as a result of the DOE's proposed actions.

The DOE contends that Governor Hodges's sole interest in this action derives from his responsibility to protect the health and well-being of the residents of South Carolina, and that this lawsuit is therefore a *parens patriae* action. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 600-02 (1982) (observing that *parens patriae* suit is one in which state asserts injury to well-being of its populace). The Supreme Court has clearly established that a *parens patriae* action cannot be maintained against the Federal Government. *Id.* at 610 n.16; *Massachusetts v. Mellon*, 262 U.S. 447, 485-86 (1923) ("[I]t is no part of [a state's] duty or power to enforce their rights in respect of their relations with the federal government. In that field it is the United States, and not the state, which represents them as *parens patriae*."). As such, if Governor Hodges seeks only to protect the health and well-being of the residents of South Carolina, his action is of the *parens patriae* variety, and it may not be pursued.

Governor Hodges maintains, however, that the interests underlying his challenge to the DOE are not simply in protecting the well-being

of South Carolinians. Rather, he contends that he has suffered an injury to his procedural rights, and that such an injury is sufficient to provide him with standing to sue. Pursuant to the Court's decision in *Defenders of Wildlife*, a person entitled to a "procedural right," e.g., the right to have the Executive observe procedures mandated by law, can thereby possess Article III standing "without meeting all the normal standards for redressability and immediacy." 504 U.S. at 572 n.7. A plaintiff only possesses such standing, however, if "the procedures in question are designed to protect some threatened concrete interest of his that is the ultimate basis of his standing." *Id.* at 573 n.8. In addition, such an interest must be one that falls within the "zone of interests" that the challenged statute is designed to protect. *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987) ("The essential inquiry is whether Congress intended for a particular class of plaintiffs to be relied upon to challenge agency disregard of the law.").

Governor Hodges contends that he possesses a "threatened concrete interest" deriving from his proprietary interest and control, as Governor, over vast swaths of land and natural resources owned by South Carolina, including the State's highways, its streams, and its woodlands. In addition, the Governor notes that, under the South Carolina Pollution Control Act, S.C. Code § 48-1-10 *et seq.*, he bears official responsibility for preserving the State's groundwater, and that under the Safe Drinking Water Act, 42 U.S.C. §§ 300f-300j, he has a similar duty to preserve and protect public drinking water. Governor Hodges maintains that these interests are all threatened by the DOE's uninformed shipment of plutonium into South Carolina and its proposed storage of such plutonium at SRS. He therefore contends that he has shown a sufficient procedural injury to accord him standing, in his capacity as Governor, to sue the DOE.

Thus, whether Governor Hodges possesses standing to sue the DOE turns on whether his asserted proprietary interests in the land, streams, and drinking water of South Carolina are sufficiently concrete to qualify as the bases for a recognized procedural right. As Justice Scalia observed in *Defenders of Wildlife*, an individual living next to the proposed site for a federally licensed dam would possess standing to challenge a failure to comply with NEPA, while an individual living across the country from the dam would not possess any such standing. 504 U.S. at 572 n.7. It is uncontroverted that at least one

state highway runs through SRS, and that several streams and wildlife habitats are located near SRS. In these circumstances, the Governor, in his official capacity, is essentially a neighboring landowner, whose property is at risk of environmental damage from the DOE's activities at SRS. Governor Hodges therefore has a concrete interest that NEPA was designed to protect; as such, he is not merely pursuing a *parens patriae* action, and he possesses the requisite standing to enforce his procedural rights under NEPA.

Because Governor Hodges has standing to initiate and maintain his NEPA challenges to the DOE's actions, we possess jurisdiction, pursuant to 28 U.S.C. § 1291, to consider his appeal. We therefore turn to the merits thereof.

## IV.

We review de novo an award of summary judgment by a district court. *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). In reviewing an agency's efforts to comply with NEPA, we are required to perform a two-step analysis. First, we examine whether the agency took a "hard look" at a proposed project's environmental effects before acting. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). In essence, we assess whether "the adverse environmental effects of the proposed action [have been] adequately identified and evaluated" prior to final decisionmaking. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). If we are satisfied that the agency has taken the mandated "hard look" at the environmental effects of a proposed agency action, we must then consider whether the agency's conclusions are arbitrary or capricious. *Hughes River*, 81 F.3d at 443. Thus, in conducting our NEPA inquiry, we must "make a searching and careful inquiry into the facts and review whether the decision [of the agency at the time it was made] was based on consideration of the relevant factors and whether there has been a clear error of judgment." *City of Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1017 (4th Cir. 1985) (internal quotations and citations omitted). If the agency has followed the proper procedures, and if there is a rational basis for its decision, we will not disturb its judgment.

## V.

In his assertion that the DOE failed to comply with NEPA, Governor Hodges raises three separate contentions. Two of these contentions are of a substantive nature, while the third involves a procedural point. First, he maintains that the 2002 SA failed to fully evaluate the risks of long-term storage of surplus plutonium at SRS-KAMS. Second, the Governor contends that the 2002 SA only considered the potential effects of storing plutonium at SRS-KAMS for up to twenty years, rather than evaluating the fifty-year storage period selected by the DOE in its April 19 ROD. Finally, as a procedural matter, the Governor asserts that the DOE failed to complete the required NEPA documents before issuing the April 19 ROD.

## A.

Before proceeding to address the specific contentions of Governor Hodges, it bears emphasizing that NEPA is an "action-forcing" statute. It requires federal agencies to identify and evaluate the environmental consequences of their proposed actions. *Robertson*, 490 U.S. at 350; *Hughes River*, 81 F.3d at 443. Under NEPA, an agency is obliged to take a "hard look" at a proposal's environmental consequences before deciding to proceed; however, once it has taken such a look, the agency is not obligated to choose any particular course of action. *Robertson*, 490 U.S. at 350. Moreover, if the agency has taken the required "hard look," we must defer to it unless its decisions were arbitrary or capricious. *Hughes River*, 81 F.3d at 443. Therefore, in assessing the merits of Governor Hodges's contentions, we must consider whether the DOE adequately identified and evaluated, prior to its April 19 ROD, the environmental consequences of storing the Rocky Flats plutonium at SRS-KAMS. If we conclude that the DOE acted properly in that connection, we must then determine whether the decisions it premised on that analysis were arbitrary or capricious.[16]

---

[16]The DOE asserts that its decisionmaking with respect to the storage and disposition of plutonium implicates foreign policy and national security concerns. As such, it contends that our review of the NEPA compliance issues should be more deferential than our normal standard of review. *See Envtl. Defense Fund, Inc. v. Massey*, 986 F.2d 528, 535

In most instances, the DOE will discharge its NEPA responsibility to take a "hard look" at potential environmental consequences by completing, prior to undertaking a proposed action, either an EIS, an SEIS, an EA, or an SA. However, in order to make an "initial determination about whether a change or new information meets the threshold of 'significance' or 'uncertainty' needed to require further environmental documentation," the DOE may also review and consider previously-issued NEPA documents. *See Piedmont Envtl. Council v. United States Dep't of Transp.*, 159 F. Supp. 2d 260, 270-71 (W.D. Va. 2001). In essence, the DOE is entitled to conduct a preliminary inquiry into whether the environmental impact of a change in an existing proposal is even possibly significant. If the DOE concludes, based on such a preliminary inquiry, that the environmental effect of the change is clearly insignificant, it has taken the "hard look" required by NEPA, and no further NEPA documentation is necessary. *See Idaho Sporting Congress Inc. v. Alexander*, 222 F.3d 562, 566 (9th Cir. 2000) (concluding that agency may use "non-NEPA environmental evaluation procedures" to determine "whether new information or changed circumstances require the preparation of a supplemental EA or EIS"); *Price Rd. Neighborhood Ass'n v. United States Dep't of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997). The DOE's authority to conduct such a review is limited; it may only conduct such a preliminary inquiry to determine whether it is possible that the altered proposal's environmental impact will be significant. *Idaho Sporting Congress*, 222 F.3d at 566. If "the environmental impacts resulting from the design change are significant or uncertain, as compared with the original design's impacts," then the DOE must complete additional NEPA documentation. *Price*, 113 F.3d at 508-09.

_____

(D.C. Cir. 1993); *cf. Hamdi v. Rumsfeld*, No. 02-6895, slip op. at 5 (4th Cir. July 12, 2002) ("[I]n the context of foreign relations and national security . . . a court's deference to the political branches of our national government is considerable."). As the D.C. Circuit has explained, the Government, in such circumstances, "may avoid the EIS requirement where U.S. foreign policy interests outweigh the benefits derived from preparing an EIS." *Id.* Because we are satisfied, applying our normal standard of review, that the DOE did not contravene NEPA, we need not consider whether foreign policy and national security considerations warrant some heightened deference to the DOE's decisions.

B.

In his first contention on the merits, Governor Hodges maintains that the DOE failed to adequately consider the risks of long-term storage of the Rocky Flats plutonium at SRS-KAMS. Contrary to his position, however, the 2002 SA evaluated whether the long-term storage of surplus plutonium at SRS-KAMS would create any environmental consequences not considered by the DOE in its earlier NEPA compliance documents. In performing this evaluation, the 2002 SA explicitly incorporated the DOE's 1996 PEIS and its 1998 SA, as well as other NEPA materials relating to the potential environmental effects of surplus plutonium being shipped into South Carolina and stored at SRS. *See* 40 C.F.R. § 1502.21 (permitting incorporation of materials by reference to "cut down on bulk without impeding agency and public review of the action"). By its 1996 PEIS, the DOE had examined various options for the long-term storage of surplus plutonium, including its possible storage at the proposed APSF facility at SRS for up to fifty years. And the 1998 SA had explored whether temporary storage of the surplus plutonium at SRS-KAMS, for a period of up to ten years, would create any environmental consequences not contemplated in the 1996 PEIS. In the 2002 SA, the DOE examined whether storage of surplus plutonium at SRS-KAMS for a period longer than ten years would create any additional impacts on the environment or would increase the risk of a nuclear accident. 2002 SA at 5-6. After performing this evaluation, the DOE concluded in the negative, stating that:

> *The potential impacts from the storage of surplus plutonium materials in the KAMS facility* at SRS, pending final disposition, *are not significantly different* than or are bounded by the impacts identified in the [1996 PEIS].

*Id.* at 8 (emphasis added).

In view of the foregoing, Governor Hodges has failed to identify any particular risk arising from the long-term storage of surplus plutonium at SRS-KAMS that was not addressed by the 2002 SA or the NEPA materials incorporated by reference therein. As such, we must conclude that the DOE, in the 2002 SA, fulfilled its NEPA obligations

by taking a "hard look" at the risks of long-term plutonium storage at SRS-KAMS.

### C.

Governor Hodges next contends that the 2002 SA only contemplated storage of the Rocky Flats plutonium at SRS-KAMS for a period of twenty years, rather than for a period of fifty years. In support of this contention, he points to its statement that the "DOE plans to [dispose of] its surplus plutonium as soon as practical and believes storage in KAMS would be necessary for less than 20 years." *Id.* Although this provision suggests that the DOE hoped (and perhaps continues to hope) to dispose of the surplus plutonium within twenty years, this isolated statement, standing alone, does not resolve the question of whether the DOE had analyzed the potential environmental consequences of plutonium storage at SRS-KAMS for a longer period. Indeed, the 2002 SA specifically analyzed the environmental impact of plutonium storage at SRS-KAMS for up to fifty years. *See id.* at 5-6 ("For the SRS workforce, storage operations at KAMS will add 0.13 Latent Cancer Fatality (LCF) for up to 50 years . . . ."). Moreover, and importantly, the 2002 SA incorporated the 1996 PEIS into its assessment and findings, and it explicitly compared the 1996 PEIS's study of long-term storage of surplus plutonium at APSF (for up to fifty years) with the DOE's new plan to store the plutonium at SRS-KAMS. We therefore find ourselves in agreement with the district court, which concluded after careful analysis that "it is clear that the fifty-year impacts of storage in general, and storage at KAMS, in particular, were examined." Opinion at 26.

### D.

Governor Hodges's final contention on appeal is that, even if the DOE substantively examined the environmental effects of its proposed action, it failed to comply with NEPA's procedures in connection with its April 19 ROD. As the district court properly observed, "the April 19 ROD decouples storage and disposition, taking away a precondition to storage of Rocky Flats plutonium at SRS which had been found in all prior RODs (approval of SRS for the immobilization facility)." *Id.* at 23. The Governor asserts that this change in the DOE's proposal — from storage at SRS-KAMS pending disposition

to storage at SRS-KAMS without regard to disposition — required the DOE to prepare and file another NEPA compliance document, such as an SA. He maintains that the DOE was required to examine whether this change in its proposal created any significant environmental impacts not previously studied, and that it had therefore failed to take a "hard look" at the environmental consequences of its April 19 ROD.

In fact, however, the DOE properly explored, prior to issuance of the April 19 ROD, whether the decoupling of plutonium storage from plutonium disposition created any new environmental concerns. The April 19 ROD specifically referenced those earlier NEPA compliance materials, and it explained the analyses they had made. After noting that the 1998 SA had analyzed the impact of storage of the Rocky Flats plutonium at SRS-KAMS for a period of ten years, the April 19 ROD made the following pertinent observation:

> [T]he storage of surplus plutonium in the KAMS facility could extend beyond the 10-year period estimated in [the 1998 SA]. Therefore, DOE prepared [the 2002 SA] . . . which evaluated the potential for storage beyond 10 years at the KAMS facility. That SA concluded that potential impacts from the continued storage of surplus plutonium in the KAMS facility at SRS for this additional period are not substantially different from those addressed in the original analysis of storage in APSF contained in [the 1996 PEIS].

67 Fed. Reg. 19,434 (Apr. 19, 2002). As this provision makes clear, the DOE, prior to issuing its April 19 ROD, conducted a preliminary inquiry by examining its previous NEPA documents, and it concluded that its decision to decouple the storage of surplus plutonium from the disposition clearly did not create any significant environmental impacts. *Idaho Sporting Congress*, 222 F.3d at 566; *Piedmont Envtl. Council*, 159 F. Supp. 2d at 270-71. As such, because it was apparent that the proposed change did not create a new environmental picture from that previously studied, the DOE decided that no further NEPA documentation was necessary. In these circumstances, we are satisfied that the DOE took a "hard look" at the environmental consequences of its proposed course of action prior to promulgating its April 19 ROD. *Idaho Sporting Congress*, 222 F.3d at 566 (recognizing limited

role for non-NEPA environmental evaluation procedures to determine whether supplemental EA or EIS is required). Therefore, because the DOE has complied with the requirements of NEPA, and because its decision to place the Rocky Flats plutonium in long-term storage at SRS-KAMS was neither arbitrary nor capricious, we will not disturb it.[17]

## VI.

Pursuant to the foregoing, Governor Hodges's NEPA challenge is without merit and the district court's award of summary judgment to the DOE is affirmed.

*AFFIRMED*

---

[17]Governor Hodges also maintains that the DOE's decisionmaking process violated the Administrative Procedure Act (the "APA"). Under the APA, we must uphold an agency decision if it is supported by "substantial evidence," and is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A), (E). In conducting our review under the APA, "we perform only the limited, albeit important, task of reviewing agency action to determine whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment." *Maryland Dep't of Human Res. v. United States Dep't of Agric.*, 976 F.2d 1462, 1475 (4th Cir. 1992)(internal quotations and citations omitted). In view of the DOE's compliance with NEPA, the Governor's APA challenge is also without merit.